**Tammy Lane HUEMMER**

v.

**MAYOR AND CITY COUNCIL OF OCEAN CITY et al.**

**Civ. No. Y–78–991.**

United States District Court, D. Maryland.

July 9, 1979.

Peter Ayers Wimbrow, III, Ocean City, Md., for plaintiff.

Thomas Waxter, Jr. and Bruce I. Rothschild, Baltimore, Md., for defendants the Mayor and City Council of Ocean City and Irving McCabe.

JOSEPH H. YOUNG, District Judge.

## I. THE FACTS

Plaintiff Tammy Lane Huemmer, proceeding in *forma pauperis*, has filed a twelve count complaint against the Mayor and City Council of Ocean City, William and Virginia Gibbs, Kenneth Kidde, and Irving J. McCabe for their individual actions resulting in the impounding of her car on February 14, 1978 in Ocean City, Maryland.

Plaintiff alleges that from July, 1977, until February 14, 1978, she had been residing with defendant Kidde in an Ocean City apartment which he rented from defendant Gibbs. On or about February 14, 1978, plaintiff "parted company" with Kidde, packing all of her personal belongings in her car before beginning to search for other living accommodations. Upon returning to the area, plaintiff discovered that her car had been towed away and impounded by McCabe, the sole proprietor of an automobile towing service, at the request of Kidde and/or the Gibbs pursuant to § 98–1, *et seq.* of the Code of the Town of Ocean City.[1] From February 14, 1978 until September 7, 1978, the car remained in the Town of Ocean City storage yard. Plaintiff claims that her requests that the car be returned were ignored for several months or refused altogether. Additionally, she states that as a result of this deprivation, she has "suffered much anxiety and distress over the loss of her sole means of transportation together with her personal belongings and effects, and much discomfort and inconvenience." Complaint at 4. Plaintiff brings this action pursuant to 42 U.S.C. §§ 1983, 1985, 1986, and 28 U.S.C. §§ 1331 and 1343. She also invokes several constitutional amendments on her behalf. By way of relief, plaintiff seeks damages for the wrongful taking and detention of her automobile, and a declaratory judgment that Chapter 98 of the Code of Ocean City is unconstitutional. Since her car and posses-

sions therein have been returned, her request for a mandatory injunction to that effect has obviously been mooted.

This Court previously dismissed the action brought against the Gibbs on the grounds that they could not be found to have engaged in activity sufficient to bring them within the "under color of state law" requirement of 42 U.S.C. § 1983. This requirement should be read narrowly to prevent individual activities which do not manifest a significantly strong nexus with state activity from giving rise to civil rights actions. There is authority, for example, to support the proposition that the "under color of state law" requirement "can rarely be satisfied in the case of anyone other than a state official." *Jobson v. Henne*, 355 F.2d 129, 133 (2d Cir. 1966). While it remains clear that private citizens can act under color of state law whenever their activities assume the character of acts traditionally associated with official conduct, *Street v. Surdyka*, 492 F.2d 368, 374 (4th Cir. 1974); *Dennis v. Hein*, 413 F.Supp. 1137, 1139 (D.S.C.1976), such findings have generally been restricted to instances in which the private individual's behavior somehow took the place of official conduct. *Larkin v. Bruce*, 352 F.Supp. 1076, 1077 (E.D.Wis.1972), *appeal dismissed*, 483 F.2d 1407 (7th Cir. 1973) (private citizen initiating public nuisance action in Wisconsin court to enjoin violation of Wisconsin abortion statute found to be acting under color of state law as a sort of surrogate attorney general); *Palmer v. Columbia Gas Company of Ohio*, 342 F.Supp. 241, 246 (N.D.Ohio 1972), *aff'd*, 479 F.2d 153 (6th Cir. 1973) (entry of gas company's collectors upon private property to shut off customer's gas had trappings of a sheriff or constable and therefore satisfied the color of state law requirement). *See also Hall v. Garson*, 430 F.2d 430 (5th Cir. 1970).

Similar reasoning mandates that the action brought against defendant Kidde, who has been served with a copy of the com-

---

1. Plaintiff's original complaint alleged that her car had been towed pursuant to Chapter 96 of the Ocean City Code. That chapter, however, relates only to the impoundment of automo-
biles on *public* property. Chapter 98, however, relates to the towing and impoundment of vehicles illegally parked on *private* property.

plaint but who has never responded, also be dismissed.

The remaining defendants, the Mayor and City Council of Ocean City and Irving J. McCabe, have moved for summary judgment urging that plaintiff may not recover damages in light of defendants' good faith immunity in implementing and enforcing Chapter 98.

## II. THE OCEAN CITY ORDINANCE

Maryland's Transportation Law sets forth the original grant of authority on which Ocean City's abandoned vehicle provisions are based:

(a) *Enumeration of powers.*—The provisions of the Maryland Vehicle Law do not prevent a local authority, in the reasonable exercise of its police power, from exercising the following powers as to highways under its jurisdiction:

(1) Regulating or prohibiting the stopping, standing, or parking of vehicles;

Md. Transportation Code Ann. § 25–102(a)(1). Pursuant to this grant of authority, Ocean City enacted Ordinance No. 1973–5–2 on May 21, 1973, to be known as the "Ocean City Impounding Ordinance." The purpose of the ordinance is as follows:

For the purpose of protecting the general welfare and public interest of the community; safeguarding the parking facilities of the citizens of the Town of Ocean City from indiscriminate trespassing and utilization; and eliminating the retarding of traffic, unnecessary street congestion, unnecessary delays and traffic hazards, the municipality shall provide impoundment facilities pursuant to the procedures provided in this chapter.

§ 98–2. While detailing the violations and penalties as well as the regulations governing licenses for towing vehicles, the ordinance also contains six sections which provide for the disposition of impounded vehicles after they have been towed:

### ARTICLE IV

Towing and Impoundment Procedure

§ 98–8. Notification of towing agency.

Any property owner may, when a vehicle is illegally parked upon his private property, notify any authorized towing agency and request removal of said vehicle. Notification shall not be made by any official of the Town of Ocean City.

§ 98–9. Tow slip.

Upon arrival at the subject property, the towing company shall cause to be presented to said property owner a tow slip which shall consist of one (1) original and three (3) copies. The towing company shall cause said tow slip to be completed by filling in all pertinent data. Before towing or removing the subject vehicle, the towing company shall cause the property owner to sign said tow slip in the place provided. The towing company shall then cause the yellow copy of the towing slip to be securely affixed to the subject vehicle.

§ 98–10. Towing.

The towing company may then proceed to tow the subject vehicle to the impoundment facility maintained by the city.

§ 98–11. Impoundment.

Upon arrival at the impoundment facility, the towing operator shall, prior to receipt of said vehicle, furnish the custodian with the white towing slip, which said slip shall be properly completed and signed by the property owner or said vehicle will be refused. The towing company shall keep the blue and pink towing slips.

§ 98–12. Inventory and inspection.

The impoundment custodian shall, prior to accepting any vehicle for impoundment, observe the exterior of said vehicle and note on an inventory sheet any obvious scratches, dents or other damage to same. He shall also indicate whether or not the keys are in said vehicle and whether or not the vehicle, including the trunk, is locked or unlocked. He shall also do an inventory of the contents of the vehicle by observation, including the contents of the trunk if said trunk is unlocked.

§ 98–13. Impoundment maintenance.

The impoundment custodian shall keep the keys to said vehicle (if same are therein) in his possession at all times while said vehicle is impounded. He shall keep the impounded vehicles under observation and make periodic inspections of said impounded vehicles.

In their motions for summary judgment, defendants recite not only the alleged deficiencies in the Complaint but also seek to justify the legality of the Ocean City ordinance on the basis of its being similar in effect to the Maryland state statute applying to abandoned vehicles, § 25–201(b), which has been in effect since 1969.[2] Defendants also submit that no action at common law for damages arises because the municipal ordinance is clearly an act governmental in nature. Additionally, defendants argue that whether or not this Court accepts the doctrine of sovereign immunity, section 1983 does not expose Ocean City to liability for passing a statute in its governmental capacity which is consistent with a state statute and enacted under the state's police powers.

## III. THE QUESTION OF STATE ACTION

■ Plaintiff brings this civil rights action pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343. Sections 1343(3) and 1983 were "intended to provide a federal judicial forum for the redress of wrongful deprivations of property by persons acting under color of state law" as stated in *Lynch v. Household Finance Corp.*, 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424, *reh. denied*, 406 U.S. 911, 92 S.Ct. 1611, 31 L.Ed.2d 822 (1972). Similar questions have

been presented recently in Connecticut and California. *See, e. g., Tedeschi v. Blackwood*, 410 F.Supp. 34 (D.Conn.1976), and *Stypmann v. City and County of San Francisco*, 557 F.2d 1338 (9th Cir. 1977). Unlike the instant case, both *Tedeschi* and *Stypmann* involved challenges to the constitutionality of state impounding ordinances where vehicles were impounded only after a police officer makes the initial determination to tow a car and summons the towing company. Here, however, plaintiff avers that the towing company acted pursuant to "the request of Mr. Kidde and Mr. and/or Mrs. Gibbs." Complaint at 3. Even where the initiation of a decision culminating in the towing and impounding of a private vehicle comes from private citizens, this Court cannot overlook the role of the municipal ordinance in establishing an overall policy violative of plaintiff's due process rights.

*Tedeschi* and *Stypmann* are instructive in reaching this conclusion. In *Stypmann*, plaintiff objected solely to the provisions of the California Vehicle Code which created a possessory lien for towing and storage charges. As in the present case, plaintiffs were unable to obtain release of their impounded car until they had paid the necessary charges. The parties were left without their car, were unable to obtain its release by posting a bond, and were denied a prompt post-seizure hearing on the validity of the impoundment. 557 F.2d at 1343.

■ Even in situations where a deprivation is temporary, the requirements of due process must be followed. *North Georgia*

---

**2.** Maryland's Abandoned Vehicle provisions read as follows:

(b) *Abandoned Vehicle.*—"Abandoned vehicle" means any motor vehicle, trailer, or semi-trailer:

(1) That is inoperable and left unattended on public property for more than 48 hours;

(2) That has remained illegally on public property for more than 48 hours;

(3) That has remained on private property for more than 48 hours without the consent of the owner or person in control of the property;

(4) That has remained in a garage for more than 10 days after the garage keeper has given the owner of the vehicle notice by registered

mail, return receipt requested, to remove the vehicle;

(5) That has remained in a garage for more than 10 days after the period when, by contract, the vehicle was to remain in the garage; or

(6) That was left for more than 10 days in a garage by:

(i) Someone other than its registered owner; or

(ii) A person authorized to have possession of the vehicle under a contract of use, service, storage, or repair.

Md. Transportation Code Ann. § 25–201(b).

*Finishing, Inc. v. Di-Chem, Inc.,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975); *Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 *reh. denied,* 409 U.S. 902, 93 S.Ct. 177, 34 L.Ed.2d 165 (1972). Noting the importance of the automobile to contemporary American lifestyles, Judge Browning wrote:

> The private interest in the uninterrupted use of an automobile is substantial. A person's ability to make a living and his access to both the necessities and amenities of life may depend upon the availability of an automobile when needed.

> The public interest in removing vehicles from streets and highways in the circumstances specified in the traffic code is also substantial, though differing in the various situations in which removal is authorized. Moreover, the government has a considerable interest in imposing the cost of removal upon the vehicle owner and retaining possession of the vehicle as security for payment. But neither of these interests is at stake here. The only government interest at stake is that of avoiding the inconvenience and expense of a reasonably prompt hearing to establish probable cause for continued detention of the vehicle. The fact that San Francisco has undertaken to provide a hearing in some circumstances suggests that it is neither unduly burdensome nor unduly costly to do so.

*Stypmann, supra,* 557 F.2d at 1342–43 (footnotes omitted). On the issue of the promptness of the post-seizure hearing, he observed that:

> "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge, supra,* 424 U.S. [319], at 333, 96 S.Ct. [893], at

902 [47 L.Ed.2d 18], quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965). Seizure of property without prior hearing has been sustained only where the owner is afforded prompt post-seizure hearing at which the person seizing the property must at least make a showing of probable cause. Neither this nor any other procedural protection is afforded here that might prevent or ameliorate a temporary but substantial deprivation of the use and enjoyment of a towed private vehicle.

> An early hearing, on the other hand, would provide vehicle owners the opportunity to test the factual basis of the tow and thus protect them against erroneous deprivation of the use of their vehicles. The only state interest adversely affected by requiring an early hearing—avoidance of the administrative burden and expense—is not enough in these circumstances to warrant denying such a hearing. We conclude, therefore, that section 22851 does not comply with due process requirements.

557 F.2d at 1343–44.[3] Having found a deprivation, *Stypmann* noted that the initial action was taken by a police officer, and the subsequent activities by private persons acting on behalf of the state and in furtherance of its vehicle policy also constituted state action:

> The towing company detains the vehicle and asserts the lien for towing and storage charges pursuant to a statutory scheme designed solely to accomplish the state's purpose of enforcing its traffic laws. Thus, the private towing company is a "willful participant in a joint activity with the State or its agents," *United States v. Price,* 383 U.S. 787, 794, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267 (1966); *see*

---

**3.** *Citing Dixon v. Love,* 431 U.S. 105, 97 S.Ct. 1723, 52 L.Ed.2d 172 (1977); *Commissioner of Internal Revenue v. Shapiro,* 424 U.S. 614, 629, 96 S.Ct. 1062, 47 L.Ed.2d 278 (1976); *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Laing v. United States,* 423 U.S. 161, 187, 96 S.Ct. 473, 46 L.Ed.2d 416 (1976) (Brennan, J., concurring); *North Georgia Finishing, Inc. v. Di-Chem, Inc.,* 419 U.S. 601, 606–08, 611–13, 95 S.Ct. 719, 42 L.Ed.2d

751 (1975) (Powell, J., concurring); *Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 665 n.2, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974); *Arnett v. Kennedy,* 416 U.S. 134, 170, 178, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (White and Powell, JJ., concurring). *See also Carey v. Sugar,* 425 U.S. 73, 77–78, 96 S.Ct. 1208, 47 L.Ed.2d 587 (1976); *Boehning v. Indiana State Employees Ass'n,* 423 U.S. 6, 96 S.Ct. 168, 46 L.Ed.2d 148 (1975).

*Culbertson v. Leland*, 528 F.2d 426 (9th Cir. 1975); and there is a "sufficiently close nexus between the State and the challenged action of the [towing company] so that the action of the latter may be fairly treated as that of the State itself." *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974).

557 F.2d at 1341–42.

In *Tedeschi*, the Ninth Circuit likewise adopted an expansive concept of state action so as to encompass the entire transaction, from the initial decision to tow through the refusal of the private towing company to return the car until the fees are paid:

> The towing of an abandoned, unregistered, or dangerously parked motor vehicle under the authority of § 14–150 by either the police or a private garage constitutes "state action," for a vehicle can be towed pursuant to this section only at the request of a state agent. Meaningful participation by a state agent, pursuant to a state statute, in the deprivation of a person's property by another private person unquestionably brings the entire transaction "under color of state law." The sole objective of § 14–150 is the removal of abandoned, unregistered, and dangerously parked vehicles, and the sole justification of the section's lien provisions is the effectuation of this state objective. Consequently, with respect to the issue of whether the implementation of the lien provisions constitutes "state action," these provisions and that authorizing towing must be dealt with as an entity.
>
> Furthermore, we conclude that even taken by itself § 14–150's creation of a garagekeeper's lien on a vehicle to the extent of towing and storage charges constitutes "state action." While Con-

necticut common law may recognize the legality of a garage lien for services on a vehicle voluntarily surrendered for the performance of these services, it does not recognize such a lien where the garage has gained possession of the vehicle without the owner's consent. *See Paton v. Robinson*, 81 Conn. 547, 554, 71 A. 730 (1909). Thus, while the mere existence of a statute *acknowledging* the legality of private conduct is not sufficient to bring the conduct "under the color of state law," here § 14–150 *authorizes* conduct which would otherwise be impermissible and, therefore, we conclude, provides for "state action."

> Finally, taken by itself, the foreclosure of a garagekeeper's lien pursuant to § 14–150 to cover towing and storage charges also constitutes "state action." Section 14–150 not only authorizes the creation of a lien on a vehicle towed under its authority, it also authorizes such a lien's foreclosure.

410 F.Supp. at 41–42 (footnotes omitted). The *Tedeschi* court formulates a distinction between "acknowledging the legality of private conduct" and the "authorization" of conduct "which would otherwise be impermissible," and this Court clearly recognizes that "[t]he validity of the detention depends upon the legality of the tow, a question 'inherently subject to factual determination and adversarial input.' *Mitchell v. W. T. Grant Co.*, 416 U.S. 600, 617, 618, 94 S.Ct. 1895, 1905, 40 L.Ed.2d 406 (1974); *see Goldberg v. Kelly*, 397 U.S. 254, 269, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970)." 557 F.2d at 1343 n.18. At the same time, however, an otherwise illegal towing is not converted into a legal one comporting with due process requirements merely because the towing company acted at the direction of a private individual as opposed to a police officer.[4] As plaintiff noted in her Responsive Memo-

---

4. In a footnote, the *Tedeschi* court made the following remark:

> On the other hand the lack of standards leaves the officer with broad discretion. In this case, for example, there was an allegation that the automobile was towed in response to the complaint of a resident of the neighborhood

who objected to the number of cars parked on the street.

410 F.Supp. at 45 n.16. We can infer that the breadth with which Ocean City's ordinance is written, *see* § 98–2, not only fails to curtail a similar "broad discretion" but also transfers the initiating authority to private individuals.

randum to defendant McCabe's motion to dismiss at 2:

> The Town issues a license. Only licensees may participate. The Town, by ordinance, sets the towing fee. The towing company tows the vehicle to a storage yard owned by the Town and maintained for that purpose. Notice is given to the owner of the vehicle by the Town. The Town detains the vehicle and asserts a lien for towing for the benefit of the towing companies.

Consequently, the City must be deemed to have been a participant in the towing process because, through its ordinance, it authorized, within the meaning discussed in *Tedeschi, supra*, an impounding ordinance failing to comply with those due process standards ordinarily required when personal property is to be confiscated. For these reasons, most notably the involvement of the City in virtually every detail of local impounding operations, this case differs from one involving a tort of conversion by one private individual against another. *See generally* W. L. Prosser, Torts § 15, at 79–97 (4th ed. 1971). While it appears that this entire incident arose from a purely personal disagreement between plaintiff and defendant Kidde, the impounding ceased to possess a wholly private character when plaintiff's car was towed pursuant to a municipal ordinance, the authority for which originated under state law. While defendants Kidde and the Gibbs acted in a purely personal capacity, the City became directly involved once the towing service came into the picture.

■ The constitutional deficiencies of the Ocean City impounding ordinance, as indicated *supra*, stem from its failure to provide an opportunity to be heard at some meaningful time before the injury occasioned by the taking becomes final. *Grannis v. Ordean*, 234 U.S. 385, 34 S.Ct. 779, 58 L.Ed. 1363 (1914). In *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 168, 71 S.Ct. 624, 646, 95 L.Ed. 817 (1965) (Frankfurter, J., concurring), Mr. Justice Frankfurter wrote that "[The] right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society." *See also North America Cold Storage Co. v. Chicago*, 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908). In the present case once a vehicle was impounded, the only way to recover possession of one's car was to pay the appropriate fees.

The reasoning of *Watters v. Parrish*, 402 F.Supp. 696 (W.D.Va.1975), is applicable to the constitutional questions raised concerning Ocean City's impounding ordinance. In *Watters*, the court found that plaintiffs had stated a cause of action under 42 U.S.C. § 1983 in challenging a towing ordinance which permitted their cars to be towed without a citation or summons being issued to the owners and without their being permitted a hearing in order to contest the actions taken. Holding that the action could be maintained against the individual towing operators where plaintiffs alleged a conspiracy between them and the state police to deprive plaintiffs of their property unconstitutionally, Judge Dalton went on to find that failure to provide a hearing at a meaningful time violated plaintiffs' due process rights, but he specifically noted that "the towing by itself was not the constitutional deprivation." 402 F.Supp. at 700. The constitutional deficiencies stemmed from the failure to provide the proper post-seizure hearing: "Plaintiffs' cause of action rests not on the seizure of the cars standing alone, but on the state's failure to provide a hearing after the seizure." 402 F.Supp. at 700.

■ Insofar as the Ocean City ordinance is concerned, it too is constitutionally defective for the same reasons articulated in *Watters*. Since the towing itself was not the constitutional deprivation, the activities of defendant McCabe, whose company towed plaintiff's vehicle, cannot be construed as subjecting plaintiff to any constitutional harm. Accordingly, the cause of action against him must be dismissed, leaving only the question of Ocean City's liability to plaintiff for monetary relief.

712

## IV. THE QUESTION OF MUNICIPAL IMMUNITY

■ Ocean City submits that under Maryland law, when a municipal government exercises its police powers, it does so in a governmental capacity. *Fowler v. Bd. of Co. Comm'rs*, 230 Md. 504, 187 A.2d 856, *cert. denied*, 375 U.S. 845, 84 S.Ct. 98, 11 L.Ed.2d 72, *reh. denied*, 375 U.S. 936, 84 S.Ct. 334, 11 L.Ed.2d 268 (1963); *State v. Baltimore County*, 218 Md. 271, 146 A.2d 28 (1958). While this observation may be accurate, it does not automatically follow that a municipality exercising its police powers in a governmental capacity must be accorded immunity from damages when it violates constitutional rights.

*Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), conferred immunity upon municipalities on the theory that "Congress did not undertake to bring municipal corporations within the ambit of [§ 1983]." 365 U.S. at 187, 81 S.Ct. at 484. As defendants note, plaintiff filed her complaint on June 2, 1978, just four days prior to the Supreme Court's decision in *Monell v. Dept. of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which overruled *Monroe* insofar as it held that local governments were wholly immune from suits under § 1983. The specific question addressed in *Monell* was:

> "Whether local governmental officials and/or local independent school boards are 'persons' within the meaning of 42 U.S.C. § 1983 when equitable relief in the nature of back pay is sought against them in their official capacities?"

436 U.S. at 662, 98 S.Ct. at 2021. Responding affirmatively, the Court premised its analysis upon an extensive reexamination of the legislative history behind the Civil Rights Act of 1871:

> Our analysis of the legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress *did* intend municipalities and other local government units to be included among those persons to whom § 1983 applies. Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional *implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.* Moreover, although the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution, local governments, like every other § 1983 "person," by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to governmental "custom" even though such a custom has not received formal approval through the body's official decisionmaking channels. (footnotes omitted).

436 U.S. at 690–91, 98 S.Ct. at 2035–2036 (Emphasis added). The Court recognized that one still could not sue a local government for an injury inflicted *solely* by its employees or agents but that there had to be some form of "official policy" or "custom" responsible as the authority for the local government's involvement. Although the *Monell* Court did not elaborate upon the scope of municipal immunity, it was unambiguous in holding that such immunity was no longer absolute:

> Since the question whether local government bodies should be afforded some form of official immunity was not presented as a question to be decided on this petition and was not briefed by the parties nor addressed by the courts below, we express no views on the scope of any municipal immunity beyond holding that municipal bodies sued under § 1983 cannot be entitled to absolute immunity, lest our decision that such bodies are subject to suit under § 1983 "be drained of meaning," *Scheuer v. Rhodes*, 416 U.S. 232, 248, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). Cf. *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 397–398, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

436 U.S. at 701, 98 S.Ct. at 2041.

*Monell* concerned a local policy involving the operation of the local school board, and

the touchstone of the Court's analysis was the presence or absence of an *official policy* which resulted in a deprivation rather than the nature of the particular municipal organ which was involved in a given incident. In other words, municipal liability under *Monell* is directly related to the impact of a given local official policy which may find its implementation through any number of local outlets, from the school board to the police department as well as through private parties acting pursuant to local policy.

█ *Monell* did not comment on the scope of any municipal immunity. Ocean City claims, however, that it has at all times acted in a governmental capacity entirely in good faith and that it is therefore entitled to immunity from damages pursuant to section 1983. *Monell* permits an action for damages under section 1983 directly against the municipality for unconstitutional acts which are embodied in a law, policy, or custom of the municipality. *See Burt v. Abel*, 585 F.2d 613, 617 (4th Cir. 1978) (applying *Monell*); *see generally* Blum, *From* Monroe *to* Monell: *Defining the Scope of Municipal Liability in Federal Courts*, 51 Temp.L.Q. 409 (1978). Since the scope of immunity now available to municipalities *after Monell* is no longer absolute, the focus turns necessarily to whether good faith immunity is available and what showing must be made to qualify for such immunity.

Even prior to *Monell*, lower federal courts had attempted to circumvent *Monroe's* holding that "person" under section 1983 did not include municipalities by finding jurisdiction under 28 U.S.C. § 1331 [5] and the due process requirement of the Fourteenth Amendment. *See generally* Blum, *supra*, at 414–20.[6] Consequently lower federal courts have frequently entertained suits against municipal corporations for the recovery of money damages for uncompensated takings of property or takings of property without due process of law. *Gagliardi v. Flint*, 564 F.2d 112, 122 (3rd Cir. 1977) (Gibbons, J., concurring), *cert. denied*, 438 U.S. 904, 98 S.Ct. 3122, 57 L.Ed.2d 1147 (1978).[7] In *Gagliardi*, the municipality urged the court to construe section 1983 as a Congressional bar to municipal liability for Fourteenth Amendment violations. The court concluded, however, that "the fourteenth amendment claim against the City was sufficiently substantial to vest the district court with federal question jurisdiction under 28 U.S.C. § 1331." 564 F.2d at 116.

While the Supreme Court's *Monell* ruling removed the need for indirectly circumventing *Monroe's* immunization of municipalities from actions under section 1983, it cre-

---

**5.** "The Civil Rights Act of 1871 (now 28 U.S.C. § 1343) created original jurisdiction in the district courts over actions [t]o redress the deprivation, under color of any State law . . . of any right . . . secured by the Constitution . . . And the Act of March 13, 1875 (now 28 U.S.C. § 1331), created general federal question jurisdiction in the district courts. The federal courts 'cease to be restricted tribunals of fair dealing between citizens of different states and became the primary and powerful reliance for vindicating every right given by the Constitution, the laws, and treaties of the United States.' [citing Felix Frankfurter and James M. Landis, The Business of the Supreme Court 65 (1928)]."

P. Brest, Processes of Constitutional Decisionmaking: Cases and Materials 1297 (1975).

**6.** *See also* Hundt, *Suing Municipalities Directly Under the Fourteenth Amendment*, 70 Nw.L. Rev. 770 (1975); Comment, *Implying a Damages Remedy Against Municipalities Directly Under the Fourteenth Amendment: Congressional Action as an Obstacle to Extension of* the Bivens Doctrine, 36 Md.L.Rev. 123 (1976); Note, *Damage Remedies Against Municipalities For Constitutional Violations*, 89 Harv.L.Rev. 922 (1976); Note, *Developing Governmental Liability Under 42 U.S.C. § 1983*, 55 Minn.L.Rev. 1201 (1971); Note, *Limiting the Section 1983 Action in the Wake of Monroe v. Pape*, 82 Harv.L.Rev. 1486 (1969).

**7.** *See, e. g., City of Inglewood v. City of Los Angeles*, 451 F.2d 948, 952 (9th Cir. 1972); *Miller v. County of Los Angeles*, 341 F.2d 964, 966–67 (9th Cir. 1965); *Lowe v. Manhattan Beach Sch. Dist.*, 222 F.2d 258, 259–60 (9th Cir. 1955); *Foster v. Herley*, 330 F.2d 87 (6th Cir. 1964); *Foster v. City of Detroit*, 405 F.2d 138, 144 (6th Cir. 1968); *Traylor v. City of Amarillo, Texas*, 492 F.2d 1156, 1157 & n.2 (5th Cir. 1974); *Haczela v. City of Bridgeport*, 299 F.Supp. 709, 712 (D.Conn.1969); *Madison Realty Co. v. City of Detroit*, 315 F.Supp. 367 (E.D. Mich.1970); *Dahl v. City of Palo Alto*, 372 F.Supp. 647 (N.D.Cal.1974).

ated a problem insofar as how section 1983 actions against municipalities for money damages should proceed in light of the pre-*Monell* findings of liability under the Fourteenth Amendment where immunity was not a bar to municipal liability. The Supreme Court, which overruled *Monroe* on the grounds that it had misread the legislative history as to the intended meaning of "person" in section 1983, never explicitly indicated in *Monell* whether it was overruling *Monroe* so as to avoid having to achieve the same result by the Fourteenth Amendment route. Under the Fourteenth Amendment approach, municipalities apparently would be absolutely liable for damages flowing from due process violations,[8] and immunity would obviously be irrelevant since the rationale behind invoking the Fourteenth Amendment route was simply to avoid *Monroe*'s immunization in the first place. After *Monell*, however, municipalities can still apparently assert an immunity defense, although the Court left unanswered the scope of that immunity and how a city could invoke it.

The Court decided *Monell* on June 6, 1978, just four days after plaintiff filed her complaint in the instant case. On the day before *Monell* was decided, the Second Circuit sitting *en banc*, announced its ruling in *Turpin v. Mailet*, 579 F.2d 152 (2d Cir.), *vacated and remanded mem. for further consideration in light of Monell v. Department of Special Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), *sub nom. City of West Haven v. Turpin*, 439 U.S. 974, 99 S.Ct. 554, 58 L.Ed.2d 645 (1978), which, in effect, accomplished through the Fourteenth Amendment what had previously been barred by *Monroe* and sanctioned the following day under *Monell*. Holding that

---

**8.** Lower federal courts have generally allowed the granting of equitable relief against municipalities. *See, e. g., Crosley v. Davis*, 426 F.Supp. 389, 396 (E.D.Pa.1977); *Hupart v. Bd. of Higher Educ.*, 420 F.Supp. 1087, 1103 n.38 (S.D.N.Y.1976); *Patterson v. Ramsey*, 413 F.Supp. 523, 528 (D.Md.1976), *aff'd*, 552 F.2d 117 (4th Cir. 1977); *Williams v. Brown*, 398 F.Supp. 155, 157 n.1 (N.D.Ill.1975).

The increasing attempts to join claims based on the Fourteenth Amendment with § 1983 claims to acquire jurisdiction over municipal defendants was commented upon in *Crosley v. Davis, supra*, 426 F.Supp. at 391. The overall trend concerning implied actions for damages under the Fourteenth Amendment has been varied. Some courts have implied such a right. *Turpin v. Mailet*, 579 F.2d 152 (2d Cir.), *vacated and remanded mem. for further consideration in light of Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), *sub nom. City of West Haven v. Turpin*, 439 U.S. 974, 99 S.Ct. 554, 58 L.Ed.2d 645 (1978); *Owen v. City of Independence*, 560 F.2d 925 (8th Cir. 1977), *vacated and remanded mem. for further consideration in light of Monell v. Department of Social Services*, 438 U.S. 902, 98 S.Ct. 3118, 57 L.Ed.2d 1145 (1978); *Adekalu v. New York City*, 431 F.Supp. 812, 818 (S.D.N.Y.1977); *Donoghue v. Behler*, 429 F.Supp. 403, 405–06 (D.N.J.1977); *Drennon v. Philadelphia Gen. Hosp.*, 428 F.Supp. 809, 813–14 (E.D.Pa.1977); *Chavez-Salido v. Cabell*, 427 F.Supp. 158, 165–66 (C.D.Cal.1977), *vacated*, 436 U.S. 901, 98 S.Ct. 2228, 56 L.Ed.2d 398 (1978); *Aiello v. City of Wilmington*, 426 F.Supp. 1272, 1283 (D.Del.1976); *Mejia v. School City of Gary*, 415 F.Supp. 370, 373–74 (N.D.Ind.1976); *Panzarella v. Boyle*, 406

F.Supp. 787, 791–93 (D.R.I.1975); *Patterson v. City of Chester*, 389 F.Supp. 1093, 1096 (E.D. Pa.1975); *Britton v. Philadelphia Police Dep't*, 69 F.R.D. 449, 450–51 (E.D.Pa.1975) (dictum); *Maybanks v. Ingraham*, 378 F.Supp. 913, 914–15 (E.D.Pa.1974); *Dahl v. City of Palo Alto*, 372 F.Supp. 647, 649–51 (N.D.Cal.1974) (dictum).

Others have refused to imply the right. *Cale v. City of Covington*, 586 F.2d 311 (4th Cir. 1978) (citing cases); *Kostka v. Hogg*, 560 F.2d 37 (1st Cir. 1977); *Jones v. McElroy*, 429 F.Supp. 848, 855–60 (E.D.Pa.1977); *Crosley v. Davis*, 426 F.Supp. 389 (E.D.Pa.1977); *Pitrone v. Mercadante*, 420 F.Supp. 1384, 1389–91 (E.D. Pa.1976), *vacated per curiam*, 572 F.2d 98 (3d Cir. 1978); *Raffety v. Prince George's County*, 423 F.Supp. 1045, 1057–58 (D.Md.1976); *Livingood v. Townsend*, 422 F.Supp. 24, 27–28 (D.Minn.1976); *Farnsworth v. Orem City*, 421 F.Supp. 830, 830–31 (D.Utah 1976); *Mitchell v. Libby*, 409 F.Supp. 1098, 1099 (D.Vt.1976); *Gambling v. Cornish*, 412 F.Supp. 243, 244–45 (N.D.Ill.1975); *Perry v. Linke*, 394 F.Supp. 323, 325–56 (N.D.Ohio 1974); *Smetanka v. Borough of Ambridge*, 378 F.Supp. 1366, 1377–78 (W.D. Pa.1974); *Perzanowski v. Salvio*, 369 F.Supp. 223, 229–31 (D.Conn.1974); *Washington v. Brantley*, 352 F.Supp. 559, 563–65 (M.D.Fla. 1972).

The Supreme Court expressly reserved this point for later decision in *Mt. Healthy Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 278–79, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). Although the Court still has not squarely faced this point, its vacating of *Turpin* can be taken as an indication that a *Bivens*-like approach is not favored. *See* note 15, *infra*.

governmental liability for damages arises whenever a municipality's employees pursue unconstitutional actions which are authorized, sanctioned, or ratified by municipal officials, 579 F.2d at 152, Judge Kaufman managed to circumvent those limitations imposed in *Monroe* by implying a damages remedy under the Fourteenth Amendment in much the same manner that the court did under the Fourth Amendment in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Noting that *Brown v. Board of Education*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), and its progeny constitute authority for courts' ability to "play an enormous role in fashioning equitable remedies under the fourteenth amendment," the court extended its powers to the ability to provide monetary relief as well: "Since the language of the amendment does not suggest any distinction between the propriety of according equitable relief and damages, we fail to see how any differentiation of substance between the forms of relief can be justified." 579 F.2d at 159. The court was explicit in stating that its use of the implied remedy under the Fourteenth Amendment was an alternative to avoid *Monroe*'s limitations on bringing such action under 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3). This attempt to "end run" *Monroe* through *Bivens*-like approaches as well as others had received sig-

nificant attention in the literature prior to the Supreme Court's *Monell* decision.[9]

Like *Monell*, though, *Turpin* expressly left open the availability of any good faith immunity defense as well as "whether a form of 'legislative' immunity is appropriate in lawsuits arising from the passage of a law that is subsequently declared unconstitutional." 579 F.2d at 166 and n.39. The dissent, which vehemently condemned the majority's usurpation of congressional prerogatives through its *Bivens*-type implied remedy,[10] argued that the majority's holding provided no guidance on the crucial matter of legislative immunity:

The majority should also make clear whether they intend their "modern" constitutional rule to apply to legislative as well as executive officers, so that our communities will know whether they are to be held financially liable for the enactment of ordinances which prove to be unconstitutional. In the field of constitutional law, consensus in interpretation is not the judicial norm. This case, with its five–four split among the judges, is no exception. If the Supreme Court accepts review and reverses, the majority will suffer only an injury to their pride. The majority should tell us whether a similar error in judgment by the community fathers in some hamlet in upstate New York or in the hills of Vermont will subject their community to liability in dam-

---

**9.** *See, e. g.*, Blum, *supra*; Levin, *The Section 1983 Municipal Immunity Doctrine*, 65 Georgetown L.J. 1483 (1977); Hundt, *supra*; Developments, *Section 1983 and Federalism*, 90 Harv.L. Rev. 1133, 1193–95 (1977); Comment, 36 Md.L. Rev. 123, *supra*; Note, *Municipal Liability in Damages for Violations of Constitutional Rights—Fashioning a Cause of Action Directly from the Constitution—Brault v. Town of Milton*, 7 Conn.L.Rev. 552 (1975).

These other means included basing liability upon 42 U.S.C. § 1981 and the possibility of bringing pendent state law claims against a municipality once general federal jurisdiction had been obtained under 28 U.S.C. § 1331(a). *See, e. g., Mt. Healthy City Sch. Dist. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

The *Turpin* court noted that it was not aware of any federal Court of Appeals which has held that a damage action should

not be implied from the fourteenth amendment where the municipality itself was responsible for the unconstitutional action. *See, e. g., Owen v. City of Independence*, 560 F.2d 925, 933 and n.9 (8th Cir. 1977); *Roane v. Callisburg Independent School District*, 511 F.2d 633, 635 n.1 (5th Cir. 1975); *Hanna v. Drobnick*, 514 F.2d 393, 398 (6th Cir. 1975); *Hostrop v. Board of Junior College District No. 515*, 523 F.2d 569, 576–77 (7th Cir. 1975); *Gray v. Union County Intermediate Education District*, 520 F.2d 803, 805 (9th Cir. 1975).

579 F.2d at 164, n.36. *See also, Gagliardi, supra*, 564 F.2d at 115–16.

**10.** These arguments were reminiscent of Justice Black's dissent in *Bivens* and were also reiterated in Justice Rehnquist's dissent in *Monell. See Bivens, supra*, 403 U.S. at 427–30, 91 S.Ct. 1999 (Black, J., dissenting).

ages. *These communities should know that if they enact an ordinance which subsequently is declared to be unconstitutional, this Court's present holding may require them to respond in damages.*

*Unlike Bivens, this case does not deal with individual defendants but with units of government created by the state. They are entrusted and charged with the primary responsibility of delivering basic support services to their residents.*

579 F.2d at 183 (Emphasis added). Insofar as good faith immunity of a municipal or state employee is implicated by his engaging in constitutionally prohibited conduct, the dissent recognized that such immunity was available as long as he can satisfy the subjective and objective elements of the defense, namely, that he believed in good faith that his conduct was lawful and that his belief was reasonable. *See, e. g., Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 *reh. denied,* 421 U.S. 921, 95 S.Ct. 1589, 43 L.Ed.2d 790 (1975); [11] *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975); *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Bivens v. Six Unknown Named Agents of Federal Bureau of Nar-*cotics, 456 F.2d 1339 (2d Cir. 1972) (on remand from *Bivens, supra,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971)). *See generally* Newman, *Suing the Lawbreakers: Proposals to Strengthen the Section 1983 Damage Remedy for Law Enforcers' Misconduct,* 87 Yale L.J. 447, 458–62 (1978). In the context of immunity for the municipality itself, the dissent reasoned that "[t]he consensus among the circuits appears to be . . . that a municipality is not entitled to the defense of 'good faith'." 579 F.2d at 182–183 and n.78, *citing Owen v. City of Independence,* 560 F.2d 925, 934 (8th Cir. 1977); *Kostka v. Hogg,* 560 F.2d 37, 41 (1st Cir. 1977); *Hander v. San Jacinto Junior College,* 519 F.2d 273, 277 (5th Cir. 1975); *see also Hostrop v. Board of Junior College,* 523 F.2d 569 (7th Cir. 1975), *cert. denied,* 425 U.S. 963, 96 S.Ct. 1748, 48 L.Ed.2d 208 (1976).

As the *Turpin* dissent observes, the majority is unclear as to whether its finding that *Monroe* can be circumvented by the Fourteenth Amendment was intended to impose "no-fault constitutional liability" upon a municipality and its officials for passing an unconstitutional statute. 579 F.2d at 183.[12] Regardless of how one would

---

11. In *Wood,* Justice White explained the relationship between these subjective and objective elements as follows:

> As we see it, the appropriate standard necessarily contains elements of both. The official himself must be acting sincerely and with a belief that he is doing right, but an act violating a student's constitutional rights can be no more justified by ignorance or disregard of settled, indisputable law on the part of one entrusted with supervision of students' daily lives than by the presence of actual malice.

420 U.S. at 321, 95 S.Ct. at 1000. Justice White further elaborated upon the objective test in *Procunier v. Navarette,* 434 U.S. 555, 562, 98 S.Ct. 855, 860, 55 L.Ed.2d 24 (1978):

> Under the first part of the *Wood v. Strickland* rule, the immunity defense would be unavailing to petitioners if the constitutional right allegedly infringed by them was clearly established at the time of their challenged conduct, if they knew or should have known of that right and if they knew or should have known that their conduct violated the constitutional norm.

*See also Bogard v. Cook,* 586 F.2d 399, 410–12 (5th Cir. 1978).

12. One commentator has strongly criticized the transportation of common law tort defenses into the area of constitutional torts.

> This is a statute passed by Congress to provide a remedy for the deprivation of constitutional rights. When such a right is denied, the victim is entitled to compensation and the public is entitled to the deterrent effect of his receiving compensation. Common law notions, heavily influenced by the concept of fault, simply have no place in the attainment of these important results. This is not to suggest that either the Constitution or section 1983 establishes strict liability, in the sense of an entitlement to compensation whenever injury is sustained. The standards of the Constitution, notably those of the Fourth Amendment, already contain a sufficient element of reasonableness to avoid any possibility that law enforcement officers will become guarantors of the liberty or well-being of those they apprehend. But these standards, however flexible, should be enforced on their own terms, without further dilution by common law defenses that evolved under a jurisprudence primarily concerned with adjusting disputes between private individuals. Constitutional standards, designed to limit

hold municipalities liable in this context, the availability and scope of any immunity merits serious attention and discussion. The problem is especially acute in light of the Supreme Court's failure to develop the issue of immunity and the likelihood that absent any judicial resolution of the matter (or even with it), the Congress may well act in the future to clarify the scope of municipal liability.[13] The scope of immunity problem becomes especially acute after *Monell* because in abolishing the absolute municipal immunity afforded by *Monroe*, the Supreme Court does not appear to be implying that municipal liability under section 1983 has suddenly become absolute. Under the *Bivens*-Fourteenth Amendment approach, the chief hurdle had been imposing liability in the face of total immunity, rather than developing the scope of qualified immunity. Now that immunity under *Monell* is no longer absolute, the constitutional dialogue must shift to the nature of immunity which now can be applied in this post-*Monell* era.

When *Monell* burst forth on the morning after *Turpin,* the need to end run *Monroe* had suddenly vanished. The *Turpin* court, obviously unable to overrule *Monroe,* did as much as possible to circumvent its limitations on municipal immunity. With *Monell,* however, Fourteenth Amendment due process claims might still be brought against municipalities directly through 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3). Yet in reviewing such cases, the Court will not have to reach the propriety of the *Bivens* approach adopted in *Turpin,* and this situation leaves open the very important question of whether *Turpin*'s reasoning is still valid, a matter which remains vital to the scope of any good faith immunity defense allowed to a municipality.[14] Only Justice Powell, in his concurring opinion in *Monell,* expressed an awareness of the need to do directly through overruling *Monroe* what courts *might* try indirectly through *Bivens.* Given the timing of *Turpin,* the irony of

governmental authority over citizens, serve a more important function.
Newman, *supra,* at 461–62.

In *Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S.Ct. 984, 988, 989, 47 L.Ed.2d 128 (1976), the Court recognized that § 1983 "creates a species of tort liability that on its face admits no immunities, and some have argued that it should be applied as stringently as it reads. But that view has not prevailed." Arguments against applying immunities have been made in *Pierson v. Ray,* 386 U.S. 547, 559, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (Douglas, J., dissenting); *Tenney v. Brandhove,* 341 U.S. 367, 382–83, 71 S.Ct. 783, 95 L.Ed. 1019 (1951) (Douglas, J., dissenting).

**13.** One such example of congressional action in this area was the proposed Civil Rights Improvement Act of 1977 which was to provide "a comprehensive scheme for the enforcement of rights protected by section 1983." Blum, *supra,* at 443. The Act was presented as S. 35, 95th Cong., 1st Sess., 123 Cong.Rec. S 205 (daily ed. Jan. 10, 1977).

**14.** Just one of the many unresolved problems created by *Monell* is whether one can still use the *Bivens* approach to hold municipalities liable in damages for due process violations so as to avoid the limitations which *Monell* imposes upon premising liability upon *respondeat superior.* One commentator has observed:

Surely, if total rejection of municipal amenability to suit under section 1983 did not foreclose the fourteenth amendment implication

question, then the rejection of vicarious liability in the section 1983 context should not preclude inquiry into the application of the doctrine of *respondeat superior* under the fourteenth amendment. . . . It is predictable, however, that *Monell* will be reviewed as lending strong support to the rejection of an implied fourteenth amendment cause of action based on *respondeat superior.* Blum, *supra,* at 418–19. The fact that *Turpin* was summarily vacated and remanded for further consideration in light of *Monell* supports the view that *Monell* will ultimately be seen as pre-empting the *Bivens* approach.

Although *Turpin* has been vacated summarily, 439 U.S. 974, 99 S.Ct. 554, 58 L.Ed.2d 645 (1978), at least one court has raised the issue of whether the *Bivens* approach has been entirely put to rest, especially in a situation where a plaintiff might be unable to demonstrate a sufficiently defined "official policy" to satisfy the *Monell* standard. Whether one could still use *Bivens* to meet a lower standard may be an open question. *Williams v. Codd,* 459 F.Supp. 804, 817 n.11 (S.D.N.Y.1978) (Carter, J.) *But see Smith v. Ambrogio,* 456 F.Supp. 1130, 1133–35 (D.Conn.1978) (Newman, J.) which cited both *Turpin* and *Monell* and held that a nonspecific complaint did not state a claim of municipal liability when it was predicated upon the inaction of senior officials which was tantamount to approval of unconstitutional acts by their subordinates.

Justice Powell's remarks is immediately apparent:

Finally, if we continued to adhere to a rule of absolute municipal immunity under § 1983, we could not long avoid the question whether "we should, by analogy to our decision in *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), imply a cause of action directly from the Fourteenth Amendment *which would not be subject to the limitations contained in § 1983 . . ."* *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 278, 97 S.Ct. 568, 571, 50 L.Ed.2d 471 (1977). One aspect of that inquiry would be whether there are any "special factors counselling hesitation in the absence of affirmative action by Congress," [*Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 396, 91 S.Ct. 1999, 2005, 29 L.Ed.2d 619] (1971), such as an "explicit congressional declaration that persons injured by a [municipality] may not recover money damages . . ., but must instead be remitted to another remedy, equally effective in the view of Congress," *id.* at 397, 91 S.Ct. [1999] at 2005. In light of the Court's persuasive re-examination in today's decision of the 1871 debates, I would have difficulty inferring from § 1983 "an explicit congressional declaration" against municipal liability for the implementation of official policies in violation of the Constitution. Rather than constitutionalize a cause of action against local government that Congress intended to create in 1871, the better course is to confess error and set the record straight, as the Court does today. 436 U.S. at 712–13, 98 S.Ct. at 2047 (Powell, J., concurring) (Emphasis added). Presumably, those "limitations contained in § 1983" might include the qualified immunities recognized in cases such as *Wood, O'Connor,* and *Scheuer, supra.* In other words, imposing liability via the Fourteenth Amendment route would not necessarily admit of the qualified immunity approach still presumably available under section 1983, and could substantially expand the remedies available beyond those of § 1983.[15]

The instant case presents the problem more graphically. Ocean City has moved

---

**15.** To the extent that *Bivens* "may be read as resting upon a premise that constitutional rights have a self-executing force that not only permits but requires the courts to recognize remedies appropriate for their vindication," the restrictions once placed upon § 1983 by *Monroe* are easily circumvented by an implied cause of action under the Fourteenth Amendment. Dellinger, *Of Rights and Remedies: The Constitution as a Sword,* 85 Harv.L.Rev. 1532, 1557 (1972). Professor Dellinger further reasons that:

the recognition in *Bivens* that legislative dispensations are not a necessary prerequisite to the development of remedies implementing the Constitution may render unnecessary a continuation of the extended judicial and scholarly debate over whether section 1983 provides any basis for recovery against municipalities. The *Bivens* decision leads to the rather striking conclusion that section 1983 may simply be unnecessary: money damages, as well as equitable relief, may be obtained in suits founded directly upon the Constitution.

*Id.* at 1559 (footnotes omitted).

In overruling *Monroe v. Pope, supra,* the Supreme Court did not indicate whether it was "rescuing" section 1983 from the expansiveness of a *Bivens* approach. If it was—that is, if the statutory provisions are now seen as "preempting" the *Bivens* approach to damages—then the focus of the debate will now turn to qualified immunity.

From the handful of post-*Monell* cases ruling on the Fourteenth Amendment approach, the emerging consensus is that *Monell* preempts the *Bivens* route. *See, e. g., Molina v. Richardson,* 578 F.2d 846, 850–53 (9th Cir. 1978) (*Bivens* extension not constitutionally mandated and prudential considerations such as respect for Congress, federalism, and availability of adequate § 1983 remedy stand as obstacles to extension of *Bivens* to municipalities); *Cale v. Covington,* 586 F.2d 311 (4th Cir. 1978) (no implied cause of action under Fourteenth Amendment since *Monell* concludes that Congress has acted under § 1983 in a manner consistent with the fifth clause of the Fourteenth Amendment); *Vasquez v. City of Reno,* 461 F.Supp. 1098, 1100–01 (D.Nev.1978) (no implied right through Fourteenth Amendment and 28 U.S.C. § 1331); *Cedar-Riverside Associates, Inc. v. United States,* 459 F.Supp. 1290, 1295–97 (D.Minn.1978) (no implied cause of action as *Monell* brings municipalities under § 1983, thereby eliminating any "gap" justifying *Bivens* approach); *Kedra v. City of Philadelphia,* 454 F.Supp. 652, 676–79 (E.D.Pa.1978) (finding of "explicit congressional declaration" in *Monell* pre-empts *Bivens* approach.)

for summary judgment, asserting inter alia, that even if its towing ordinance is unconstitutional, it is immune from damages since it acted at all times in good faith. In response, plaintiff argues that Ocean City can hardly have acted in good faith since the meaning of due process under the Fourteenth Amendment has been clear for some time. Plaintiff cites *Fuentes v. Shevin,* 407 U.S. 67, 80, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556, *reh. denied,* 409 U.S. 902, 93 S.Ct. 177, 34 L.Ed.2d 165 (1972), to demonstrate her point:

> For more than a century the central meaning of procedural due process has been clear: "Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified." *Baldwin v. Hale,* 1 Wall. 223, 233, 17 L.Ed. 531. See *Windsor v. McVeigh,* 93 U.S. 274, 23 L.Ed. 914; *Hovey v. Elliott,* 167 U.S. 409, 17 S.Ct. 841, 42 L.Ed. 215; *Grannis v. Ordean,* 234 U.S. 385, 34 S.Ct. 779, 58 L.Ed. 1363. It is equally fundamental that the right to notice and an opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62.

Defendant submits that it is under no duty to anticipate changes in constitutional law, *O'Connor v. Donaldson,* 422 U.S. 563, 577, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), while plaintiff's point is that there have been no changes: the law is and has been settled for some time.

Although damages could not be awarded, due process claims could be brought under section 1983 prior to *Monell.* With this bar to damages under section 1983 removed, this case raises the question of whether a city can be held liable for enacting an ordinance which is subsequently declared unconstitutional on the theory that qualified good faith immunity is unavailable since the city knew or should have known that its actions were, in a given instance, unconstitutional. Both *Turpin*'s Fourteenth

Amendment analysis and *Monell*'s section 1983 analysis fail to reach the issue of municipal liability for damages as a result of actions taken pursuant to a statute subsequently determined to be unconstitutional. Under *Turpin,* liability would appear to be less restricted although possibly not absolute, whereas under *Monell,* all we can definitely conclude is that immunity is no longer absolute.

A related question, raised by defendant Ocean City, concerns the matter of legislative immunity for the Mayor and City Council which enacted the towing ordinance. One of the first cases to consider the implications of the scope of section 1983 immunity was *Tenney v. Brandhove,* 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951). In *Tenney,* the plaintiff alleged that members of a state legislative committee had summoned him to appear before them, not for a bona fide legislative purpose, but to coerce him into keeping quiet on certain matters of public concern. Holding that plaintiff could not sue the committee members for the alleged loss of his constitutional rights, the Court concluded that immunities "well grounded in history and reason" were not abrogated "by covert inclusion in the general language" of section 1983. 341 U.S. at 376, 71 S.Ct. at 788.

*Tenney* established that "§ 1983 is to be read in harmony with general principles of tort immunities and defenses rather than in derogation of them. *Imbler v. Pachtman,* 424 U.S. 409, 418, 96 S.Ct. 984, 989, 47 L.Ed.2d 128 (1976). The immunity established under *Tenney* was absolute, and Justice Powell, writing for the Court in *Imbler,* which established absolute immunity under section 1983 for a state prosecuting officer, characterized its scope as follows: "Regardless of any unworthy purpose animating their actions, legislators were held to enjoy under this statute their usual immunity when acting 'in a field where legislators traditionally have power to act.' [341 U.S. at 379, 71 S.Ct. 783]." 424 U.S. at 418, 96 S.Ct. at 989.[16]

---

**16.** When a municipality is performing legislative, as opposed to administrative functions, inquiry into its motives in enacting an ordinance cannot be made, but will be presumed to

■ Plaintiff Huemmer seeks to recover damages against Ocean City for its council's legislative action in passing an unconstitutional towing ordinance, claiming that the City could not possibly have acted in good faith in light of clear due process precedents pointing towards the ordinance's unconstitutionality. This argument, however, cannot be employed to overcome the absolute *legislative* immunity for creating an act. Liability, if any, under section 1983, must attach because of *executive* action taken by a municipality in enforcing or implementing a policy passed by a "legislative" act.[17] Without this distinction, a city could escape liability altogether through pleading legislative immunity for every act it ever takes, and this would defeat the holding of *Monell.* 436 U.S. at 690–91, 98 S.Ct. 2018.

Accordingly, defendant's claim that Ocean City is protected from liability for damages under section 1983 because of "legislative immunity" is without merit. As explained above, the councilmembers' motives in passing an ordinance are not subject to good faith scrutiny, and this result shields individual councilmembers in their legislative capacity from personal liability under section 1983. This result, however, does not protect the city as an entity or its agents, employees, and servants from liability in applying and implementing that legislation.

be proper. *Municipal Corporations,* 56 Am. Jur.2d § 143 (1971).

17. *See Dombrowski v. Eastland,* 387 U.S. 82, 85, 87 S.Ct. 1425, 1427, 18 L.Ed.2d 577 (1967) (immunity doctrine "is less absolute, although applicable, when applied to officers or employees of a legislative body, rather than to legislators themselves.")

18. The Court refuses to accept plaintiff's facile implication of unconstitutionality with *per se* bad faith. Such an approach would totally warp section 1983 jurisprudence which, despite criticism that tort concepts should be irrelevant, has always "[been] read against the background of tort liability." *Monroe v. Pape,* 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d·492 (1961). *Monroe* rejected the imposition of a specific intent requirement in section 1983 claims; however, more recent cases have modified the tort context by requiring a showing

■ To shield itself from liability, the city must then prevail in its claim that it acted in good faith in promulgating the towing ordinance now held to be unconstitutional. Plaintiff argues that such a claim could not be made in light of the fact that Ocean City had every good reason to know that its ordinance violated due process standards. To accept plaintiff's reasoning on this point would be to equate unconstitutionality, an *ex post* decision which is not always immediately apparent at the time of promulgation, with lack of good faith. Such a standard would be a harsh one, indeed, especially given the fact that constitutional adjudication is frequently an uncertain enterprise at best. The scope of the Fourteenth Amendment's due process clause has not always been the subject of bright line interpretation, and the presence of certain distinguishable facts in a given case may tend to obscure the relevance of prior holdings. What seems obvious at the time plaintiff claims injury or when an ordinance is held unconstitutional may not have appeared so at the time of its promulgation.[18]

This Court recently had occasion to consider the matter of good faith immunity after *Monell* :

The standard for good faith immunity in § 1983 actions was recently addressed by the Supreme Court in *O'Connor v.*

approaching what might be called a "blameworthy state of mind." Blum, *supra,* at 441 n.178 and cases cited therein.

This "blameworthiness" requirement has been evolved within the development of the qualified good faith immunity doctrine in general and definitely militates against imposing strict liability in the case of a misreading or misapplication of a constitutional standard. *Wood v. Strickland, supra,* which was limited to the "specific context of school discipline," 420 U.S. at 322, 95 S.Ct. 992, developed a standard by which ignorance of the law was explicitly equated with "actual malice," and therefore, bad faith. 420 U.S. at 321, 95 S.Ct. 992. In his concurring opinion, Justice Powell remarked that in light of such a requirement, "it would appear that even good-faith reliance on the advice of counsel is of no avail." 420 U.S. at 329 n.2, 95 S.Ct. at 1004 n.2.

*Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), and *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214, *reh. denied,* 421 U.S. 921, 95 S.Ct. 1589, 43 L.Ed.2d 790 (1975). In *O'Connor,* the Court held that a State Mental Hospital's Superintendent could be held personally liable for monetary damages only if he "knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of [the patient], or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to [the patient]." 422 U.S. at 577, 95 S.Ct. [2486] at 2494, *citing Wood v. Strickland,* 420 U.S. at 322, 95 S.Ct. 992. An official has "no duty to anticipate unforeseeable constitutional developments," 422 U.S. at 577, 95 S.Ct. [2486] at 2495, and good faith reliance on a policy which later is held unconstitutional cannot lead to liability for money damages where the officials and individuals responsible for devising and implementing that policy did so without malice.

In *Wood v. Strickland, supra,* the Court elaborated a good faith immunity test to be applied to the conduct of school board members:

A compensatory award will be appropriate only if the school board member[s] ha[d] acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith.

420 U.S. at 322, 95 S.Ct. [992] at 1001. Mr. Justice Powell, in a separate opinion, phrased the standard for qualified immunity of a government official as "whether in light of the discretion and responsibilities of his office, and under all of the circumstances as they appear at the time, the officer acted reasonably and in good faith." 420 U.S. at 330, 95 S.Ct. [992] at 1005 (Powell, J., concurring in part and dissenting in part). Aside from plaintiff's broad allegations, there is nothing in the record to indicate that the municipal and medical defendants, or the court official, acted in disregard of plaintiff's constitutional rights.

*Gross v. Pomerleau,* 465 F.Supp. 1167 (D.Md.1979) (Young, J.). In *Gross,* the Court concluded that while *Monell* "would apparently allow § 1983 liability for an unconstitutional policy . . ., it does not abrogate the good faith immunity defense which these defendants may successfully invoke." *Id.* *See also Bertot v. School District No. 1 Albany County, Wyoming,* No. 76–1169 (10th Cir. Nov. 15, 1978).[19]

In *Ohland v. City of Montpelier,* 467 F.Supp. 324 (D.Conn.1979), a policeman

**19.** In *Bertot,* the U.S. Court of Appeals for the Tenth Circuit held that a qualified good-faith immunity could be applied to a local school board when a jury had specifically found that school board members had acted in good faith. The ruling in *Bertot,* however, was recently distinguished in *Shuman v. City of Philadelphia,* 470 F.Supp. 449 (E.D.Pa.1979), when a police officer was discharged pursuant to an unconstitutional police department policy requiring officers to answer questions about personal matters unrelated to their job performance during the course of an official investigation. The court awarded him back pay assessable against the city. Unlike *Bertot* which involved what the *Shuman* court termed an ad hoc decision, the requirement affecting police officers was an official municipal policy and as such was found to deprive the city of any qualified good faith immunity defense.

Insofar as the instant case is concerned, this Court declines to follow the *Shuman* reasoning. Whether an outcome is the result of an ad hoc decision or an official municipal policy is irrelevant to the application of qualified good faith immunity. The *Shuman* court appears to be saying that wherever a municipal policy is successfully challenged, qualified good faith immunity is automatically precluded as a defense. Such an outcome is at odds with the requirements of *Monell* and would certainly warp section 1983 jurisprudence in an unfortunate direction. If a school board can make an ad hoc decision in good faith, then there is no reason why a municipality, given the appropriate circumstances, should be deprived of an opportunity of showing that its challenged policy was adopted wholly in good faith. To do otherwise would be to import an uneven form of strict liability into this area of constitutional litigation.

filed a section 1983 action claiming that he was improperly discharged without a hearing after having served on the force for eleven months. Finding that the officer's due process rights were unquestionably violated, the court went on to hold that the municipal entity was entitled to invoke a qualified good faith immunity for its actions since application of strict liability in a governmental context would lack the deterrence justification applicable in the realm of private enterprise:

> [T]he imposition of strict liability against governmental entities acting in good faith . . . would be of questionable value as an additional deterrent to unconstitutional conduct, since by its terms the good faith defense requires a reasonable belief that the conduct ordered or approved of was constitutional. The retroactive application of damage awards to situations where public decisionmakers "could not reasonably have been expected to be aware of a constitutional right that had not yet been declared," . . . cannot deter unconstitutional conduct unless decisionmakers are expected to be prescient.

At 344–345.

In finding that a qualified good faith immunity is available to municipalities under section 1983, the Court recognizes that the creation of the immunities structure under section 1983 does not find direct statutory support.[20] Nonetheless, federal courts have created such immunities as part of general federal common law, *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 923, 1 L.Ed.2d 972 (1957), and the *Monell* holding can be read as an invitation by the Supreme Court to lower federal courts to initiate the debate as to whether federal common law should extend similar immunities to municipalities.[21] One writer has characterized this process whereby federal common law is generated as follows:

> If neither governmental immunity nor its abrogation can be found to be implicit in § 1983, then the burden of fashioning a federal common law of governmental immunity must be faced squarely by the courts. Thus, the question becomes how they should fashion a federal law of governmental immunity, and what sources of law should influence their determination. When federal courts must rely on sources of law not specifically provided by the statute in question, they may look to the law of the state in which the action arose, or they may fashion a uniform federal standard drawing on the Constitution, federal and state statutes or the common law.

Comment, 43 U.Colo.L.Rev. at 122 (footnote omitted). Since section 1983 was intended to provide a cause of action for violations of constitutional rights, the federal government's interest in having a uniform federal common law of governmental immunity outweighs any suggestion that immunity questions should be shaped according to the state law of the jurisdiction where the claim arose. *See, e. g., Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573,

---

20. Judge Newman has observed that "The good faith defense was imported into section 1983 rather casually from the common law, has been extended uncritically and operates in practice at best to create confusion and at worst to defeat legitimate claims." *Newman, supra*, at 459. "A finding that governmental immunity from damage actions was implicit in § 1983 would require a severe distortion of the historical strength of that immunity." Comment, *Suing Public Entities Under the Federal Civil Rights Act: Monroe v. Pape Reconsidered*, 43 U.Colo.L.Rev. 105, 121 (1971). Traditional reasons advanced for the incorporation of immunity into section 1983 include "the interests of federalism, state autonomy, and the need for uninhibited legislative, judicial, and official action." Note, *Section 1983: A Civil Remedy for the Protection of Federal Rights*, 39 N.Y.U.L. Rev. 839, 852 (1964).

21. Justice Jackson described the creation of federal common law as follows:

> [Federal law] is found in the federal Constitution, statutes or common law. Federal common law implements the federal Constitution and statutes, and is conditioned by them. Within these limits, federal courts are free to apply the traditional common-law technique of decision and to draw upon all the sources of the common law in [nondiversity] cases[.] *D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.*, 315 U.S. 447, 472, 62 S.Ct. 676, 686, 86 L.Ed. 956 (1942) (Jackson, J., concurring).

87 L.Ed. 838 (1943) (federal court looks to law of state where claim arose); *Indian Towing Co. v. United States*, 350 U.S. 61, 65–68, 76 S.Ct. 122, 100 L.Ed. 48 (1955) (Frankfurter, J.) (court refuses to read state law into the Federal Tort Claims Act).

Clearly the overriding purpose of the [Civil Rights] Act [of 1871] was to provide both an adequate and available remedy independent of state law. This purpose and the absence of any legislative doctrine of governmental immunity in § 1983 gives the federal court a fairly clear mandate to establish a uniform federal rule based upon contemporary policy considerations.

Comment, 43 U.Colo.L.Rev. at 124.

For these reasons, this Court finds that a uniform federal common law of municipal immunity should evolve, and the clearest source for that law is the immunity which currently exists for individuals.[22] As indicated already, *Monell*'s abolition of absolute immunity does not lead to imposition of absolute liability for municipalities. It may well be that ultimately all immunities will be abolished or that municipalities will be shielded from liability for "governmental" rather than "proprietary" functions.[23] The picture is obviously complicated by virtue of the fact that a municipality is simultaneously a corporate agent and a government.

This Court sees no reason to depart from the immunities structure now applied with respect to individuals under section 1983. To depart from this structure merely because a city may possess the deeper pocket guaranteeing recovery of damages would have the effect of once again bifurcating the meaning of "person" under section 1983.

Without a qualified good faith immunity, a city would be a "person" insofar as liability would be concerned but unlike natural persons would be denied a qualified immunity defense. As long as there are qualified immunities for "persons" and municipalities are now considered "persons", then to find otherwise would be to create an arbitrary and unsupportable distinction. Unless immunities are to be abolished completely and all persons made absolutely liable, a result which does not follow from *Monell*, then qualified immunities analogous to the present judicially-evolved structure should prevail for cities.

Section 1983 was intended to remedy constitutional *torts*. While criticism has been directed against this amalgamation of common law tort, especially tort defenses, and constitutional rights, these objections have overlooked the fact that removing the *tort* element from section 1983 would drastically alter the impact of that section altogether. Under the *Bivens* approach through the Fourteenth Amendment, the tort element drops out altogether with damages and remedies being provided in a purely *constitutional* setting. There can be no doubt that the present system, which is neither wholly constitutional law nor wholly tort law, will offend the purist for whom the phrase "constitutional tort" may itself be an anomaly. In such a case, section 1983 is entirely unnecessary. However, until Congress overhauls section 1983 or the Supreme Court clarifies the ambiguities and unanswered questions in *Monell*, the qualified immunities structure must be presumed to remain in place. *Cale v. City of Covington, supra*, 586 F.2d at 317 (*Monell* does not imply "untrammeled municipal liability").

---

22. Application of immunity insofar as municipalities are concerned should not be done routinely or unthinkingly. Once the source of any qualified immunities has been identified, the next step is to articulate the factors which courts should balance in reaching a final determination. One commentator has recommended consideration of the following factors: "The character and severity of the plaintiff's injury, the existence of alternative remedies, the capacity of a court or a jury to evaluate the propriety of the officer's actions, and the effect of liability whether of the officer or of the treasury on effective administration of the law." L. Jaffe, Judicial Control of Administrative Action 241 (1956). *See generally*, P. Bator, D. Shapiro, P. Mishkin, & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System, 1418–21 (2d ed. 1972).

23. The history of immunities and the current general confusion on the subject has been examined in W. L. Prosser, Torts, 970–87 (4th ed. 1971).

■ Under the standards of good faith, Ocean City would be able to prevail in its claim of qualified immunity. Although its towing ordinance has been held unconstitutional, there is no evidence other than plaintiff's idle speculation that the city acted maliciously or with conscious disregard of plaintiff's due process rights. Having concluded as a matter of law that passing an unconstitutional ordinance absence additional circumstances of "blameworthiness" is not *per se* indicative of bad faith, the Court finds that summary judgment is proper. As defendant Ocean City acknowledges, its towing ordinance was modeled after the Maryland Abandoned Vehicle Statute which also fails to provide a hearing and has never been challenged constitutionally. Md. Transportation Code Ann. §§ 25–201, *et seq.*

Ocean City makes the following argument in support of the need for a qualified good faith immunity:

> . . . some form of qualified immunity must be extended to municipalities if they are to be permitted to discharge their governmental duties with independence and without inhibition. Exposing a municipality to unlimited liability for the passage and enforcement of ordinances which are designed to protect the safety, health and welfare of its citizens is likely to lead to a paralysis of local government. A municipality could very easily be deterred from the passage and enforcement of legislation needed for the public good if it feared that the legislation might be deemed unconstitutional thus exposing the municipality to unlimited liability. Some form of qualified immunity must be extended to municipalities.

Memorandum in Support of Defendant's Motion for Summary Judgment at 8–9. This argument is especially compelling in the case of Ocean City which is a resort town often bedeviled by chaotic traffic and parking problems. While no doubt overzealous, the towing ordinance at issue here was part of an attempt to meet these unusual local needs.

Ocean City has submitted an affidavit from Mayor Harry W. Kelly to the effect that the city, its agents, servants, and employees acted at all times in good faith in enforcing its towing ordinance. There are also indications that both Ocean City and the State of Maryland will be revising their towing statutes so as to provide the necessary hearings. Emory A. Plitt, Jr., an Assistant Attorney General of Maryland, has also submitted an affidavit which corroborates Ocean City's contention that it was following the State's example and in doing so acted in complete good faith. Consequently, the Court concludes that both Ocean City and its agent, McCabe, are entitled to prevail on their claim of good faith immunity.

Plaintiff's state law claims arising out of this action cannot be heard pursuant to this Court's pendent jurisdiction in light of her failure to succeed in her federal claims. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

Similarly, in light of the reasons provided above and the absence of any evidence pointing to a conspiracy to interfere with plaintiff's civil rights, her action against the remaining individual defendants under 42 U.S.C. § 1985 must be dismissed. Having failed to prove her section 1985 claim, plaintiff's action under 42 U.S.C. § 1986 must meet a similar fate. *Dowsey v. Wilkins*, 467 F.2d 1022 (5th Cir. 1972).

Accordingly, it is this 9th day of July, 1979, by the United States District Court for the District of Maryland, ORDERED:

That defendants' motions for summary judgment be, and the same are, hereby GRANTED.