Steve J. DE FRANKS, Jr.; Robin C. De Franks; Kenneth W. Barney and Joan W. Barney, Appellants,

v.

MAYOR AND CITY COUNCIL OF OCEAN CITY and Council of Unit Owners of Pyramid Condominiums and Braemer Towers' Condominiums Association, Inc. and Daniel Scott Oliver t/a Oliver's Towing Service, and James Steve Venturino t/a Honey's Towing Service, Appellees.

No. 84–1624.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 6, 1985.

Decided Nov. 21, 1985.

---

Peter Ayers Wimbrow, III, Ocean City, Md., for appellants.

Thomas Waxter, Jr., (Kathleen Pontone, Donna L. Jacobs, Semmes, Bowen & Semmes, Baltimore, Md., on brief), and William J. Kobokovich, Jr., (George L. Huber, Jr., Huber & Lutche, Baltimore, Md., Guy R. Ayres, III, Ayres, Jenkins, Gordy & Almand, Ocean City, Md., John H. Bolgiano, Smith, Somerville & Case, Bayard Z. Hochberg, Baltimore, Md., on brief), for appellees.

Before SPROUSE and WILKINSON, Circuit Judges, and HAYNSWORTH, Senior Circuit Judge.

HAYNSWORTH, Senior Circuit Judge.

In two separate incidents, automobiles belonging to couples on vacation in Ocean City, Maryland were towed from private parking lots because of a failure to display required parking permits. In each instance, the automobile owners obtained release of their vehicle upon the payment of a $50 towing and impoundment fee. Each couple requested and obtained a post-impoundment hearing during which one hearing officer ruled that the tow was illegal because the owners had actually obtained a permit, though they had failed to display it. Their $50 payment was refunded. In the other case, the officer ruled that the tow was lawful, even though the owners had obtained a parking permit, because of the requirement of the ordinance that the permit be displayed.

Each couple filed an action under 42 U.S.C.A. § 1983 seeking compensatory and punitive damages, attorney fees, and a declaration that the ordinance was unconstitutional.

The district court upheld the constitutionality of the statute, and we affirm its ruling.

I.

Ocean City, Maryland is a beach resort community on a narrow strip of land. It attracts summer vacationers in large numbers. Its off-season population of approximately 5,000 people swells on summer weekends to approximately 250,000. In Ocean City, there are approximately 10,000 condominium units, 116 hotels containing approximately 6,000 rooms, 800 apartment buildings, and many cottages. In addition, particularly on summer weekends, many visitors come just for a day at the beach without overnight housing. It is estimated that on a summer weekend visitors may come in as many as 75,000 automobiles.

Such an influx of automobile driving visitors obviously cannot be accommodated by public parking available on the streets of Ocean City. In order to attract and retain patronage, the owners of rental units have found it necessary to provide private parking, but they appear to have provided for no more than their own essential needs. Mr. and Mrs. DeFranks rented a unit in Pyramid Condominium where there were 171 units and 171 parking spaces. Mr. and

Mrs. Barney rented a unit at Braemar Towers Condominium for a week. At Braemar there were 245 units and 261 parking spaces, including two reserved for handicapped individuals and two for service vehicles.

## II.

With such a scarcity of parking spaces, unauthorized use of private parking facilities became a concern to Ocean City officials, as well as to the owners of rental housing units seeking to serve the convenience of their patrons. The response was the adoption of an ordinance authorizing the owners of private parking lots to impose a permit requirement. The ordinance required the posting of conspicuous signs to inform arriving automobilists of the permit requirement and warning them that vehicles not displaying the appropriate permit would be towed away. When the owner of a lot found a vehicle on his lot not displaying a permit, he was authorized to call a towing company who would then tow the vehicle to the public impoundment lot where it would be received, inventoried and protected by city employees. The owner could reclaim the vehicle upon payment of the towing and impoundment fees.

As initially enacted, the ordinance contained no provision for a hearing on the question of the lawfulness of the tow of an impounded vehicle. The constitutionality of that action was challenged in *Huemmer v. Mayor and City Council of Ocean City,* 474 F.Supp. 704 (D.Md.1979), affirmed in part, reversed or vacated in part, and remanded, 632 F.2d 371 (4th Cir.1980). In its opinion, the district court held explicitly that the ordinance was defective because of its failure to provide a post-seizure hearing as to the validity of the tow and the impoundment. We, too, held the ordinance "manifestly defective" because "[n]o opportunity was presented for notice and a hearing to establish whether or not the initial removal of the vehicle was rightful or wrongful." *Id.* 632 F.2d at 372.

After the decision of the district court in *Huemmer,* a revised towing ordinance was enacted as § 98. It retained the old scheme of towing upon the complaint of the owner of the private parking lot, but it added a provision requiring written notice to the owner of the vehicle, within one working day of the tow, of his entitlement to a hearing on the question of legality of the seizure, the hearing to be had within twenty-four hours after a request for it. Thus, the mayor and city council of Ocean City undertook to supply the deficiency that the district court and we had pointed out in the earlier ordinance.

## III.

In determining what process is due the owner of an automobile towed and impounded upon a charge that it was illegally parked, the courts have considered those relevant factors identified in *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976). Thus, in *Sutton v. City of Milwaukee,* 672 F.2d 644 (7th Cir.1982), the court held that it was enough that there was a provision for a prompt post-impoundment hearing. The interest of the owner in not having his possessory interest temporarily interrupted the court found to be slight compared with the public interest in having illegally parked vehicles promptly cleared, even in non-emergency situations. Indeed, a pre-towing hearing would be entirely ineffective, for the vehicle could not be removed until the owner was identified, notified, and offered an opportunity to be heard. By that time, a polite request that the owner remove the offending vehicle would usually be as effective as a towing threat. Moreover, a requirement of a hearing before towing the vehicle would largely destroy the deterrent effect of the towing threat; the operator of a vehicle could park it illegally with full assurance that his automobile would not be moved until, after notice to him, he had an opportunity to move it himself.

Other cases involving the towing of illegally parked vehicles have come to the same conclusion. *Cokinos v. District of Columbia,* 728 F.2d 502 (D.C.Cir.1983); *Goichman v. City of Aspen,* 590 F.Supp. 1170 (D.Colo.1984); *Goichman v. Rheuban Motors, Inc.,* 682 F.2d 1320 (9th Cir.1982);

*cf. Stypmann v. City and County of San Francisco,* 557 F.2d 1338 (9th Cir.1977) (finding unconstitutional a towing ordinance that provided for a post-seizure hearing within five days for those unable to pay the towing fee).

There are differences between *Sutton* and those other cases and this one. Those other cases involved the towing of vehicles illegally parked on public streets or public property, and the towing had been directed by a police officer. In this case, the towed vehicles had been parked in private parking lots, and the towing was instigated not by a policeman but by the owner of the lot. Nothing said by the district court or by this court in *Huemmer* suggests any problem arising out of those differences, but there we had to identify the obvious infirmity of the absence of a provision for any hearing. Hence, we must consider whether those differences are of any consequence. We conclude that they are not.

In a community such as Ocean City, the existence and operation of private parking lots makes a great contribution to the accommodation of visitors. Regulation of access to them is as important to the public as is regulation of parking on public streets. Without the deterrent effect of an enforceable permit system, the owners of parking lots would be forced to employ full-time attendants with barrier-gates or suffer the dispossession of their licensees and the loss of their ability to accommodate their patrons. Valuable parking spaces would not be available for those who had paid for them but would largely be free for appropriation by persons of little conscience.

Nor do we find of any moment the fact that no public official is involved until the towed automobile reaches the impoundment lot. The permit system, hinged as it is to the display within the parked vehicle of its permit, is easily and simply enforced. So long as the permittee does not neglect to leave his permit on display, as these plaintiffs did there is no substantial risk of error. Upon periodic inspection, lot owners may readily and accurately determine whether a permit is displayed within a parked vehicle. Since the ordinance re-quired the owner to execute an affidavit that the vehicle to be towed did not display a permit, a requirement that a policeman be summoned to verify the sworn fact would have no substantial tendency to reduce the risk of a mistake.

This is not a question calling for judgment or full understanding of municipal ordinances relating to parking on public streets. Whether the permit is displayed is a simple, readily observable question of fact. If it were misstated by the lot owner, he would be expected to be called upon by the automobile's owner to answer for it.

A requirement that a policeman be called in every instance before towing would impose some burden upon Ocean City's police department and its finances. It could occasion delays in the removal of unauthorized vehicles. It would complicate a simple procedure. Since it is not apparent that it would result in any material reduction in the risk that a mistake might be made, we find no basis in the due process clause for a requirement of police intervention.

### IV.

For these reasons, we affirm the grant of summary judgment for the defendants.

AFFIRMED.